IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| DARTANION A. MCGEE, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 3:14-cv-01776 |
| | ) | |
| vs. | ) | Judge Crenshaw |
| | ) | JURY DEMAND |
| FOOD WARMING EQUIPMENT, INC., | ) | |
| BRIAN GATES, JOE PILKINGTON, | ) | |
| DEREK CODDINGTON, and | ) | |
| PHILLIP OHLSON, | ) | |
| | ) | |
| Defendants. | ) | |

MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT

Come Defendants Food Warming Equipment, Inc. ("FWE"), Brian Gates ("Gates"), Joe Pilkington ("Pilkington"), Derek Coddington ("Coddington") and Phillip Ohlson ("Ohlson") (collectively "FWE Defendants"), by and through undersigned counsel, in accordance with the applicable Federal Rules of Civil Procedure and Local Rules of Court and submit this Memorandum of Law In Support of Defendants' Motion for Summary Judgment. The FWE Defendants submit that there are no disputed issues of material fact and that they are entitled to a judgment as a matter of law dismissing with prejudice all of Plaintiff's claims.

I.      FACTUAL BACKGROUND AND CLAIMS

Plaintiff was previously employed by FWE in the position of electrical assembler. As an electrical assembler, he assembled electrical parts and units. (Plaintiff's Dep., p. 67.2-6 & 67.15-21) Plaintiff commenced his employment at FWE on August 20, 2012 and worked there through March 4, 2014 when he resigned his employment by leaving a voice mail message. For the most

1

part he was a satisfactory employee aside from occasional "counselings" regarding things such as tardiness, attendance and cell phone usage.  In this short employment period Plaintiff contends that he "was subjected to severe, pervasive, and chronic harassment based upon his race" (Complaint, ¶ 21; Docket Entry No. 1); denied promotional opportunities "in favor of White employees" (Complaint, ¶ 29; Docket Entry No. 1); and passed over for promotion because of his race, retaliated against for engaging in protected activity, and constructively discharged." (Complaint, ¶ 30; Docket Entry No. 1)

FWE is an Illinois corporation with a production facility located in Portland, Tennessee. (Complaint, ¶3; Docket Entry No. 1)  It manufactures foodservice equipment such as warming and refrigeration equipment.  Its production facility was previously located in Crystal Lake, Illinois until operations there ceased in early 2013.  (Gates Dep., p. 32.9)  The Portland, Tennessee facility began production in late summer or early fall 2012.  (Gates Dep., p. 31.13-16)

Against the backdrop of his employment with FWE and his resignation of the same, the specific claims which Plaintiff asserts are as follows:

• Race discrimination,  hostile work environment, retaliation and constructive discharge against FWE in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq*. ("Title VII"), the Tennessee Human Rights Act, T.C.A. § 4-21-101, *et seq*. ("THRA"),  and 42 U.S.C. § 1981 (Section 1981)[1];

• Aiding and abetting in violation of the THRA against Gates, Pilkington, Coddington and Ohlson[2];

• Retaliation in violation of the THRA against Gates[3] ; and

• Outrageous conduct directed toward him in violation of the common law of Tennessee against the FWE Defendants[4] .

---

[1] Counts One, Two, Three, Four, Five and Six, Plaintiff's Complaint; Docket Entry no. 1.
[2] Count Seven, Complaint; Docket Entry No. 1.
[3] Count Eight, Complaint; Docket Entry No. 1.
[4] Count Nine, Complaint; Docket Entry No. 1.

2

The FWE Defendants deny that there is any merit whatsoever to Plaintiff's claims and allegations and according request that this court dismiss the same.

## II.    APPLICABLE LAW AND ARGUMENT

### A.    Summary Judgment Standard

Rule 56(c)(2), of the Federal Rules of Civil Procedure expressly provides that a motion for summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." The plain language of Rule 56, thus, mandates the entry of summary judgment after adequate time for discovery and on motion against a party who fails to make a showing sufficient to establish an essential element of that party's case and on which he will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986). "In such a situation, there can be 'no genuine issue as to any material fact, since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. The moving party is entitled to a judgment as a matter of law' because the nonmoving party has failed to make a sufficient showing on an essential element of his case with respect to which he has the burden of proof." *Id*. at 323.

A defendant who moves for summary judgment may meet its initial burden of showing that there is no genuine issue of material fact by "showing – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case." *Id.* This serves to shift the burden of producing evidence to the nonmoving party. In other words, if the nonmoving party has the burden of proof at trial, the moving party has no burden to negate the

nonmoving party's claim. The moving party need not produce any evidence showing an absence of a genuine issue of material fact. Instead, the moving party may show an absence of evidence, and if it does so the nonmoving party may not rest on his allegations. Rather, he must set forth specific facts demonstrating the existence of an issue for trial. Fed. R. Civ. P. 56(e).

A genuine issue of material fact exists only when the nonmoving party makes a sufficient showing to establish the essential elements of his case on which he will bear the burden of proof at trial. *CMACO Automotive Systems, Inc. v. Wanxiang America Corp*., 589 F.3d 235, 242 (6th Cir. 2009). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 252, 106 S. Ct. 2505, 2512 (1986). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380, 127 S.Ct. 1769, 1777, 167 L.Ed.2d 686 (2007).

The FWE Defendants submit that there are no disputed issues of material fact, and that they are entitled to judgment as a matter of law dismissing with prejudice all of Plaintiff's claims.

**B.    Plaintiff's Claims for Race Discrimination, Harassment and Retaliation in Violation of Title VII, Section 1981 and the THRA Should be Dismissed.**

1.    <u>Claims Pursuant to Title VII, Section 1981 and the THRA are Analyzed Similarly.</u>

Plaintiff  asserts claims against FWE for race discrimination,  hostile work environment, retaliation and constructive discharge in violation of Title VII, the THRA, and Section 1981. Claims for employment discrimination involving race based discrimination may be brought pursuant to federal law under either Title VII or Section 1981. *Head v Timken Roller Bearing*

4

*Co*. 486 F2d 870 (6th Cir. 1973).  Courts apply the same analysis to claims brought under the THRA as those brought under the federal discrimination laws.  *Bender v. Hecht's Dep't Stores*, 455 F.3d 615, 620 (6th Cir. 2006); *Jones v. Memphis Light, Gas and Water Div*.,  346 Fed.Appx. 38, 43 (6th Cir. 2009).


       2.      <u>*De Minimis* Employment Actions are not Actionable</u>.

Title VII, Section 1981 and the THRA do not define the phrase "discriminate against." The Sixth Circuit in *White v. Burlington Northern & Santa Fe Ry.*, 364 F.3d 789, (6th Cir. 2004) noted the lack of a definition, and stated that "courts have made clear that not just any discriminatory act by an employer constitutes discrimination under Title VII."  Employment actions that are *de minimis* are not actionable under Title VII.  *Bowman v. Shawnee State Univ.,* 220 F.3d 456, 462 (6th Cir. 2000).  "If every low evaluation or other action by an employer that makes an employee unhappy or resentful were considered an adverse action, Title VII would be triggered by supervisor criticism or even facial expressions indicating displeasure."  *Primes v. Reno*, 190 F.3d 765, 767 (6th Cir. 1999).

To prevent lawsuits based upon trivial workplace dissatisfactions, courts require that a plaintiff prove the existence of an "adverse employment action." *Hollins v. Atlantic Co.,* 188 F.3d 652, 662 (6th Cir. 1999) (defining "adverse employment action" as a "materially adverse change in the terms and conditions of [plaintiff's] employment").  The Eleventh Circuit has explained that a discrimination law is not a "code of civility,"  and that an employment action is not adverse simply because the employee dislikes it or disagrees with it.  Not everything that makes an employee unhappy is an actionable adverse employment action.  An employment action must meet a "threshold level of substantiality" before it can serve as the basis for an employment claim.  *Higdon v. Jackson*, 393 F.3d 1211, 1219 (11th Cir. 2004).

5

3.    The Race Based Discrimination Claims

Plaintiff claims that FWE failed to promote him and provided him with lower pay increases because of his race in violation of Title VII, Section 1981 and the THRA.  (Complaint, Count One; Docket Entry No. 1)  Title VII, Section 1981 and the THRA prohibit employers from discriminating against an employee on the basis of race.  In this action, FWE submits that Plaintiff is unable to provide any direct evidence of race based discrimination.   Accordingly, he must proceed forward in establishing her claims through the *McDonnell-Douglas*[5] burden shifting analysis by establishing a *prima facie* case through circumstantial evidence.

In order to establish a *prima facie* case of race based discrimination, Plaintiff must show that (1) he is a member of a protected class; (2) he has suffered an adverse employment action; (3) he was performing her job satisfactorily; and (4) similarly-situated employees who are not members of the protected class were treated more favorably. *Hartsel v. Keys,* 87 F.3d 795, 800 (6th Cir. 1996).

Once a *prima facie* case has been established, FWE then has the burden of setting forth a non-discriminatory reason for the adverse employment action.  *Id.*   If it provides such a reason, the burden shifts back to the Plaintiff to prove by a preponderance of the evidence that FWE's proffered reason for its actions is pretextual.  *Id.*  In other words, the Plaintiff must show that "but for" membership in the protected class, he would not have been the object of the discrimination.

a.   Plaintiff was not denied a promotional opportunity because of his race.

Plaintiff in his responses to written discovery identifies a number of positons that he was "passed over for" or "denied."  (Plaintiff's Dep,, Ex. 3; Response 5, Plaintiff's Responses to Defendant's First Set of Interrogatories, Requests for Production of Documents, and Requests for

---

[5] *McDonnell-Douglas v. Green*, 411 U.S. 792, 36 L. Ed. 2d 668, 93 S. Ct. 1817 (1973).

Admissions)  The only real promotional opportunity which Plaintiff seems to claim that he was denied because of his race is the positon of Lead on Second (night) Shift Electrical Assembly. Plaintiff's race had nothing to do with the selection process, and he was not denied positon because of his race.

Mike Wells, a Caucasian, was selected for the position.  Plaintiff and David Vanderlee, a Caucasian were considered for the position.  (Coddington Dep., p. 34.14-15; 36.13-15; 38.13-14) Coddington made the decision to select Wells for the second shift (night) lead position. (Coddington Dep., p. 34.7)  Coddington made this decision because he did not perceive that Plaintiff was interested in this position based on his discussions with him.  (Coddington Dep., pp. 36.7-10; 37.6)  Plaintiff even acknowledged that he doesn't "think that anybody goes to a job and asks to work on second shift from the first shift" because "it's not preferred."  (Plaintiff's Dep., pp. 111.23-24; 112.1)

Pilkington had input into the decisional process and recommended Wells for the positon. He did not recommend Plaintiff because of his unwillingness to work on Saturdays and his tardiness issues.  (Pilkington Dep., p. 5-8) Plaintiff had been "counseled" on several occasions because of his tardiness issues. (Coddington Dep., pp. 46.13-15; 48.20-21)

Plaintiff is unable to demonstrate that FWE's proffered reason for its decision is pretextual for race based discrimination and accordingly Plaintiff's claim for denial of a promotional opportunity should be dismissed.

> b.  Plaintiff did not receive lower pay increases than his comparators because of his race.

Plaintiff seems to compare his pay increases with those of Mike Wells and David Vanderlee, two individuals employed in the Electrical Assembly Department at or about the

same time as Plaintiff.  (Plaintiff's Dep., p. 84.3-5)  When the comparisons are made, Plaintiff's beginning compensation of $12.00 per hour, his rate at the end of his probationary period at ninety days of $12.50 per hour, and his rate at the end of twelve months of $14.50 is line with his comparators.

Vanderlee became employed by FWE on October 15, 2012 shortly after Plaintiff.  (Gates Dep., p. 72.18)  He is Caucasian.  (Gates Dep., p. 72.23)  Vanderlee's starting rate of compensation was $12.00 per hour.  (Gates Dep., Ex. 4)  Vanderlee had six years of experience in the Navy as an electronics technician at the time he started with FEW, a level of experience not possessed by Plaintiff.  (Gates Dep., p. 75.12-17)   His compensation was increased at the end of his probationary period to $13.00 per hour.  (Gates Dep., Ex. 4)  Vanderlee was moved into a new position on May 27, 2013 and his compensation in that position was increased to $15.00 per hour.  (Gates Dep., p. 74.17-24)

Mike Wells became employed by FWE on August 22, 2012.  His starting rate of pay was $12.00 per hour.  (Gates Dep., Ex. 4)  Wells is Caucasian.  (Gates Dep., p. 72.23)  Wells' compensation was increased at the end of his probationary period to $13.00 per hour. Wells' compensation at the end of twelve months of employment with FWE was $14.50 per hour, the same as that of Plaintiff.  (Gates Dep., Ex. 4)

Plaintiff and Wells started at the same rate of pay, and at the end of one year were paid the same rate.  Plaintiff is unable to demonstrate that similarly-situated employees who are not members of the protected class, in this instance Vanderlee and Wells, were treated more favorably.  Accordingly, Plaintiff's race discrimination based claim that he received lower pay increases than his comparators should be dismissed.

4.    Plaintiff Was Not Subjected to a Racially Hostile Work Environment.

Plaintiff alleges that he was subjected to a hostile work environment throughout his nearly one and one half years of employment at FWE because of his race. He specifically alleges that his "supervisors and coworkers subjected him to pervasive and chronic racial harassment, comments, 'jokes,' and undermining comments because of and related to his race that were verbally abusive and disrespectful," and that [t[he harassing comments and racist 'jokes' were highly offensive and continued for the length of Plaintiff McGee's employment." (Complaint, Count Four; Docket Entry No. 1)

a.    The alleged conduct giving rise to a hostile work environment

Plaintiff identified the following conduct through his interrogatories responses as constituting "every 'racially charged, racially insensitive, and racist comment'" upon which he bases his hostile work environment claims. His responses along with certain explanation from his deposition are set forth below:

• In the latter part of 2013, Jeff, last name unknown ("LNU"), who works on the laser machine told Plaintiff that the service person from Amada, was his "service boy."

• Plaintiff is not certain of the date, but probably in the latter part of 2013, Chris Malo and Ryan Agee were at a table in the lunchroom and Plaintiff was at the next table. Messrs. Malo and Agee were talking about and disparaging President Obama loudly enough for Plaintiff to hear.[6]

• Plaintiff is not certain of the date at this time, but thinks it might have been in approximately August 2013, Plaintiff was working on a small cabinet unit when he was approached by Defendant Pilkington. At this time, Defendant Pilkington was Plaintiffs direct supervisor. Defendant Pilkington made a statement that was essentially as follows: Tay, you're gonna love this. I got a joke to tell you. When I was in high school on the football team, only one black guy. Pep rally - friends in stand. I was a football player. The black guy's name was called at the pep rally for him to come out. When he did, everybody started throwing tissue at him. Kidding around playing with him. He started picking it up and everybody was laughing at him. Can you believe he's picking it up? So, I yell out, hey that ain't cotton you're picking up -can you believe he tried to fight me man -1 said I was just joking. Then, Plaintiff got a leave request and wrote that the reason for leaving was "RACISM." Defendant Pilkington commented that the Plaintiff

---

[6] Interestingly Plaintiff for a certain period of time had his caller ID set to display "Barack Obama" when he called. (Plaintiff's Dep., p. 186.25-187.3)

had just written "racism" on a piece of paper and then asked Plaintiff had he just written "racism on a piece of paper." Plaintiff responded that he did because of what Defendant Pilkington just said to him. The Plaintiff returned to work on the next workday, but no one approached him about his complaint. So, he asked Defendant Pilkington about the complaint and what he did with it. Defendant Pilkington told him that he turned it into Human Resources.

•       Plaintiff is not certain of the date, but probably mid to late 2013, Mayra Granados told Plaintiff that her son asked her if he had to like black people because a friend at school told him he didn't. Ms. Granados seemed to think that it was a legitimate question. Plaintiff is not aware that anyone overheard it and does not know who has knowledge.

•       In July 2013, Defendant Coddington stated to Plaintiff, "y'all got OJ Simpson, we have George Zimmerman." This comment was made the day after the not guilty verdict for Mr. Zimmerman on charges that he murdered Tray von Martin and was in response to Plaintiffs statement of shock at the not guilty verdict.

•       Plaintiff is unsure of the date at the present time, but Mayra Granados told Plaintiff that "all Blacks are lazy." but made an exception for Plaintiff, telling him he was not, but reaffirming that all other "Blacks are lazy."[7]

•       At the time the eating area was under construction, Michael Adams called Hispanics "beaners." Plaintiff did not know what that meant at the time, but the tone of it sounded derogatory. Mr. Adams would say something to Plaintiff to the effect that "the beaners" were messing things up.

•       During Plaintiffs entire time of employment with FWE and in his presence, Defendant Coddington, Bob Fitch and possibly Defendant Ohlson called Kaleb McClellan names, including Radio. Mr. McClellan hated it and repeatedly asked them to stop, which they refused to do. Cuba Gooding, Jr. portrays a mentally challenged minority in a movie, both with the name "Radio."

•       Plaintiff is uncertain about the date at this time, but Defendant Ohlson told Plaintiff that he painted his tools white because they are "cotton picking tools."

•       In the fall of 2013, Mr. Wells, who was Plaintiffs immediate supervisor at the time, and Defendant Coddington joined a conversation with Plaintiff and another co-worker. Plaintiff had suggested that the co-worker take his car to be repaired at Plaintiffs friend's shop. Although Defendant Coddington did not know Plaintiffs friend, Defendant Coddington warned the co-worker about taking his car for repair at Plaintiffs friend's shop. Defendant Coddington said that if he took the car there for repair, he would probably have his radio stolen. Mr. Wells laughed. Plaintiff McGee asked Mr. Wells if he had heard that racist comment from Defendant Coddington. Mr. Wells laughed and said he did. Defendant Coddington laughed and threatened to fire Mr. Wells if he had "heard"

_____

[7] During the verbal exchange which included this comment, Plaintiff referred to Granados as a "fat bitch." (Plaintiff's Dep., pp. 138.4-22' 262/15-17)

that statement. Defendant Coddington then told Plaintiff McGee that he came out on the floor and made racist statements to put himself in a better mood.

•    During the same conversation as that one set forth in the immediately preceding paragraph Defendant Coddington insinuated Plaintiff was up to no good with something he was selling and said that Plaintiff had "connections."

•    During Plaintiffs entire employment with FWE, Plaintiffs initial supervisor, Defendant Pilkington, would refer to Blacks as "coloreds" whenever he was describing an event that involved a Black person. Defendant Pilkington referred to Plaintiff as "colored" and told Plaintiff he was his "favorite colored person."[8]

•    During Plaintiffs entire employment with FWE, Plaintiffs initial supervisor, Defendant Pilkington, used the word "ni****" in "stories" and "jokes."[9]

•    Plaintiff does not remember the date at this time, but knows he was working in Bottoms at the time, when another supervisor, Defendant Ohlson told Plaintiff McGee that "white people are here (gesturing high near his head); black people are here (gesturing low near his groin)."

•    During Plaintiffs entire period of employment with FWE, Defendant Ohlson made racist "jokes" and comments.  Plaintiff does not remember the date at this time, but probably January 2014 Defendant Ohlson old Plaintiff about a "plantation" house he was thinking about buying. He was very excited about it. The next day he told Plaintiff that the property still has the little plantation houses on it - slave quarters. Plaintiff McGee asked Defendant Ohlson if he was worried about the house being haunted. Defendant Ohlson told Plaintiff McGee that he did not care if there were spirits, "as long as they are in the field working" and then he laughed.

•    Plaintiff told Patrick LNU what Defendant Ohlson just said. That is when Mr. Wells started talking about a "slave graveyard" that he has on his property. Plaintiff kept telling him that Defendant Ohlson was being racist, but instead of taking corrective action, Mr. Wells joined in and started talking about slave graveyards.

•    Plaintiff does not remember the date at this time, but Defendant Coddington told Plaintiff that for Black History Month he hired "Blacks," and for Christmas, he fired them.

•    Plaintiff does not remember the date at this time, but Ryan Agee, a supervisor, made it a point to have me listen to "music" in which Mr. Agee was rapping and Mr.

---

[8] In his deposition, Plaintiff conceded that these comments occurred only toward the beginning of his employment, and that they stopped after Plaintiff requested that Pilkington stop.  (Plaintiff's Dep., pp. 163.25-164.19)

[9] In his deposition, Plaintiff conceded that Pilkington's use of the "n" word stopped when Plaintiff and Pilkington "started working on somewhat of a relationship."  (Plaintiff's Dep., pp. 199.25-200.5)

Agee said the word "n'**** "in it over and over.

•　　Bob Fitch made many racist "jokes" and several times said "my dog hates black people" and "most dogs hate blacks."

•　　Plaintiff does not remember the date at this time, but in the office Dave Vanderlee said "you don't want to make a Black man angry..."

•　　Plaintiff does not remember the date, but Defendant Coddington said one reason he doesn't hire Blacks is because Plaintiff set the standard so high and he expects every Black person that comes in to work just like Plaintiff, but they don't.

•　　Mr. Wells showed Plaintiff a photograph of a White woman holding a sign that said "somebody give Obama a blowjob so we can impeach him."

•　　During Plaintiffs entire employment with FWE, racist "jokes" and statements about Blacks and/or Hispanics were told on almost a daily basis ….

(Plaintiff's Dep,, Ex. 3, Response 9, Plaintiff's Responses to Defendant's First Set of Interrogatories, Requests for Production of Documents, and Requests for Admissions)

　　b.　Plaintiff was not subjected to racially hostile environment.

　　The above conduct as alleged, even though potentially insensitive and inappropriate, does not create a hostile working environment.　A hostile work environment arises "[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the terms and conditions of the victim's employment and create an abusive working environment."　*Lyle v. Cato Corp.*, 730 F.Supp. 2d 768 (M.D. Tenn. 2010) quoting *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21, 114 S. Ct. 367, 126 L.Ed. 2d 295 (1993).

　　"In order to establish a hostile work environment claim, an employee must show the following:　1) the employee is a member of a protected class, 2) the employee was subject to unwelcome harassment, 3) the harassment was based on the employee's race, 4) the harassment affected a term, condition, or privilege of employment, and 5) the employer failed to take

12

reasonable care to prevent and correct any harassing behavior." *Lyle* at 778.

A court must consider the "totality of the circumstances" in making this determination. *Williams v. General Motors*, 187 F.3d 553, 562 (6th Cir. 1999). A court is also required to utilize both an objective and subjective test: "the conduct must be severe or pervasive enough to create an environment that a reasonable person would find hostile or abusive and the victim must subjectively regard the environment as abusive." *Bowman v. Shawnee State Univ.* 220 F.3d 456, 462 (6th Cir. 2000). "Appropriate factors for the court to consider when determining whether conduct is severe or persuasive enough to constitute a hostile work environment 'include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Id.* quoting *Harris*, 510 U.S. at 23.

An isolated offensive utterance even if it "engenders offensive feelings in an employee would not sufficiently alter terms and conditions of employment" and is not evidence of race based discrimination. *Jones v. Cont'l Cuisine, Inc.,* 353 F. Supp. 2d 716, 720 (E.D. La. 2004). A "slur is not in and of itself proof of actionable discrimination, even if repeated." *Shager v. Upjohn Co.,* 913 F. 2d 398, 402 (7thCir. 1990).

FWE submits that Plaintiff is unable to establish all of the required elements of his claims for a hostile work environment in violation of Title VII, Section 1981 and the THRA based on the above alleged conduct. Accordingly this court should grant the FWE Defendants Motion for Summary and dismiss this claim.

5.    Neither FWE nor Gates Retaliated against Plaintiff in Violation of Title VII, Section 1981 or the THRA.

Plaintiff is unable to establish the necessary elements of his retaliation claims and accordingly they should be dismissed. In order to establish a *prima facie* case of retaliation, a

plaintiff must produce admissible evidence that (1) he engaged in protected activity, (2) the activity was known to the defendant, (3) plaintiff was subjected to materially adverse action, and (4) there was a causal connection between the protected activity and the adverse action. *Wade v. Knoxville Utils. Bd.,* 259 F.3d 452, 463 (6th Cir. 2001).

Once this showing is made, a, the defendant must respond by articulating a legitimate non-retaliatory reason for the adverse employment action at issue. If the employer articulates such a reason, the burden shifts back to the plaintiff to show that the proffered reason was not its true reason but merely a pretext for retaliation. *Ladd v. Grand Trunk W. R.R.,* 552 F.3d 495, 502 (6th Cir. 2009). The burden of persuasion remains with the plaintiff throughout. *Id.*

Through his interrogatory responses, Plaintiff identified the following retaliatory actions allegedly occurring after the filing of his Charge of Discrimination with the EEOC:

- Provided his first written reprimand although Plaintiff was not doing anything other than what he had done in the past;

- Was locked out of the ADP timekeeping system and was not given access to it;

- Was intimidated, shunned and not treated the same as before he filed the EEOC Charge of Discrimination by Defendant Gates who refused to give him a copy of the employee handbook, although he repeatedly asked for one to know the procedure for dealing with issues;

- Mr. Gates and his Human Resources Department were not responsive to any of Plaintiffs requests or concerns;

- Plaintiffs supervisors, including Defendant Gates and Coddington treated his requests for leave differently and more stringently; and

- Plaintiff was watched by supervisors and his movements and activities started being scrutinized, cataloged and recorded in a very negative manner.

(Plaintiff's Dep,, Ex. 3; Response 14, Plaintiff's Responses to Defendant's First Set of Interrogatories, Requests for Production of Documents, and Requests for Admissions)

Plaintiff's contention that he was given a write up, a Performance Improvement Plan ("PIP") after the filing of his EEOC charge is correct. However, this was not the first time that "he was watched" or that performance deficiencies were addressed with Plaintiff either verbally or in a written document. The PIP addressed Plaintiff's "excess absences and/or tardiness." (Plaintiff's Dep., Ex. 7) Coddington mentioned Plaintiff's tardiness to him earlier. (Coddington Dep., pp. 46.13-15; 48.20-21) Additionally, in his Performance Review dated August 21, 2013 Plaintiff's tardiness and being at work on time were addressed as areas where he was "below standard" and that needed work. (Gates Dep., Ex. 9) Finally, Plaintiff had been "counseled" about other issues including acting professionally with co-workers and his cell phone usage. (Gates Dep., pp. 182.18-183.2; Coddington Dep., pp. 46.13-15; 48.20-21)

It is well settled law that Plaintiff "cannot immunize [himself] from an adverse employment decision arising out of inappropriate workplace behavior unrelated to her protected [conduct]." *Cockrel v. Shelby County Sch. Dist*., 270 F. 3d 1036, 1059 (6thCir. 2001). That is certainly the situation here as Plaintiff has essentially admitted that he was absent many of the days for which he received the PIP. (Plaintiff's Dep., pp. 225.22; 238.2-5) However, he disagrees that it was appropriate to discipline him for such conduct. As this Court is aware, it does not sit as a "super personnel department" to second guess an employer's business judgment or to substitute its judgment for that of an employer. *Headrick v. W. Reserve Care System*, 355 F. 3d 444, 462 (6th Cir. 2004).

Plaintiff, much like other employees, needed to have his password reset to access FWE's ADP timekeeping system. This was a regular request by employees at FWE, it occurring a "handful" of times each week. (Gates Dep., p. 63.18-21) Plaintiff may have encountered difficulties, whether of his own making or otherwise, with his ADP password. However, he was

15

not locked out. The problem was ultimately resolved. (Plaintiff's Dep., p. 236.13) Moreover this did not make a "materially adverse change in the terms and conditions of his employment" as is required for actionable retaliation. *Hollins v. Atlantic Co, Inc*., 188 F.3d 652, 662 (6th Circ. 1999)

A copy of the FWE Employee Handbook was provided to Plaintiff at the time his employment with FWE commenced. He kept his copy of the handbook. (Plaintiff's Dep., p. 59.19-25; Ex. 5) Plaintiff makes some sort of allegation that he was denied a copy of the Employee Handbook in retaliation for the filing of his EEOC Charge. This contention is certainly curious given Plaintiff's admission that FWE provided him with a copy of the same, and he continued to possess it. Regardless, this did not make a "materially adverse change in the terms and conditions of his employment" as is required for actionable retaliation. *Hollins* at 662.

Further, Plaintiff elected to inject his lawyer into his issues with FWE prior to the time of his resignation and in connection with his discrimination based complaints. Gates received correspondence from Plaintiff's lawyer, Cynthia Sherwood Mckenzie dated February 25, 2014 advising that she was available to meet on April 3, 2014 to discuss Plaintiff's race discrimination claims. Gates interpreted the letter and follow up e-mails as requesting future communications to occur through her. At that point Gates advised her that future communications should occur with FWE's lawyer. (Gates Dep., pp. 191.11-192.18; Ex. 27) Certainly after these communications information did not flow quite as smoothly between FWE and Plaintiff as lawyer became involved.

Many of the actions about which Plaintiff complains as being retaliatory, if occurring as alleged, are *de minimis* in the sense that they did not make a "materially adverse change" in the terms and conditions of Plaintiff's employment. The reason for the adverse employment action

requirement is to prevent lawsuits based upon trivial workplace dissatisfactions, such as many of those things about Plaintiff complains as being retaliatory. The discrimination laws are not codes of civility, and an employment action is not adverse simply because the employee dislikes it or disagrees with it. Not everything that makes an employee unhappy is an actionable adverse employment action. An employment action must meet a "threshold level of substantiality" before it can serve as the basis for an employment claim. *Higdon v. Jackson,* 393 F.3d 1211, 1219 (11th Cir. 2004)

Plaintiff is unable to establish his claims of retaliation against FWE in violation of Title VII, Section 1981 or the THRA, or against Gates in violation of the THRA. Plaintiff is unable to meet either his *prima facie* burden or demonstrate that FWE's articulated basis for its action is pretextual. Accordingly such claims should be dismissed.

### C. Neither Gates, Pilkington, Coddington nor Ohlson "Aided and Abetted" the Actions of Other Persons to Engage in Alleged Discriminatory Practices.

Neither Gates, Pilkington, Coddington nor Ohlson engaged in conduct which "aided and abetted" the actions of others to engage in alleged discriminatory practices. The THRA "generally does not impose individual liability on supervisors and coworkers." *McNeail-Tunstall v. Marsh*, 307 F. Supp. 2d 955, 974 (W.D. Tenn. 2004). The THRA does, however, make it a discriminatory practice to "aid, abet, incite, compel or command a person to engage in any of the acts or practices declared discriminatory by [the THRA]." T.C.A. § 4-21-301(2). Again, Plaintiff's claims against Gates, Pilkington, Coddington and Ohlson are based on this statutory provision.

Plaintiff through written interrogatories was requested to identify the facts supporting his claims against Gates, Pilkington, Coddington and Ohlson pursuant to T.C.A. § 4-21-301. Those

17

facts are set forth below:

       1.      The alleged conduct of Gates

Plaintiff states that Gates "made untrue statements in his EEOC responses and Department of Labor documents and other statements.". (Plaintiff's Dep,, Ex. 3; Responses 18 &19, Plaintiff's Responses to Defendant's First Set of Interrogatories, Requests for Production of Documents, and Requests for Admissions)  Gates is FWE's Director of Human Resources and has held that positon since July 2012.  (Gates Dep., p. 14.4-11)  Upon being questioned in his deposition about the aforementioned statement, Plaintiff curiously was unable to identify any untrue statements made to either the EEOC or the Department of Labor.  (Plaintiff's Dep., pp. 252.1-254.16)

       2.      The alleged conduct of Pilkington

Plaintiff points to that conduct involving Pilkington set forth in Section II. B. 4. a. above and additionally states that Pilkington "made untrue statements in his EEOC responses and Department of Labor documents and other statements."  (Plaintiff's Dep,, Ex. 3; Responses 18 &19, Plaintiff's Responses to Defendant's First Set of Interrogatories, Requests for Production of Documents, and Requests for Admissions)

Upon being questioned about Pilkington's conduct, Plaintiff explained that he was "[n]ot holding his position to the full extent as far as when comments are being made, not going and reporting it, engaging and participating with the comments."  (Plaintiff's Dep., pp. 259.19-22)  Plaintiff acknowledged that he would not be aware of what Pilkington did or did not report.  (Plaintiff's Dep., p. 267.11-12)  He further stated that Pilkington made "statements," "he might have been around to hear it, not doing nothing to stop it, allowing it to take place, participating in it …", that "he come through and say, 'I got a joke, you're going to love this' and already

smiling I would say that's kind laughing, yes," and that he laughed at "[w]hat other people might have said." (Plaintiff's Dep., pp. 260.7-25)

Pilkington commenced his employment with FWE in April or May 2012 working in FWE's facility in Crystal Lake, Illinois. He moved to Tennessee in June 2012 and worked in maintenance. Pilkington moved into a supervisor positon four to five months later and held that position until October 2013 when he moved into research and development. (Pilkington Dep., pp. 17.4; 18.8-9; 19.14-17; & 21.16-21)

      3.      The alleged conduct of Coddington

Plaintiff points to that conduct involving Coddington set forth in Section II. B. 4. a. above, that he failed to properly investigate "Ms. Granados' statement to Plaintiff that 'all blacks are lazy,'" that [h]e also threatened to 'fire' Mr. Wells if he admitted to hearing [Coddington's] racist statements as set forth in [Section II. B. 4. a. above], and that he "made untrue statements in his EEOC responses and Department of Labor documents and other statements." (Plaintiff's Dep,, Ex. 3; Responses 18 & 19, Plaintiff's Responses to Defendant's First Set of Interrogatories, Requests for Production of Documents, and Requests for Admissions)

Regarding the alleged actions of Coddington, Plaintiff testified that he did not believe that he was doing his job because he failed to address the discriminatory conduct, and because he participated in it. (Plaintiff's Dep., pp. 261.5-13; 262.4-11) Plaintiff specifically referenced an incident involving Mayra Granados that Coddington allegedly did not investigate. Curiously Plaintiff testified that Coddington talked to him about it because Granados had reported Plaintiff's conduct in referring to her as a "fat bitch" to Coddington. (Plaintiff's Dep., pp. 138.4-22; 262.15-17)

Coddington began work with FWE in Crystal Lake, Illinois prior to moving to Tennessee in 2011. Shortly after moving to Tennessee, he became the Assistant Production Manager at the Portland facility, a positon which he held until late 2014 when he became the Continuous Improvement Manager. (Coddington Dep., pp. 19.22; 20.20-23; 22.22-23.5)

4.      The alleged conduct of Ohlson

Plaintiff points to that conduct involving Ohlson set forth in Section II. B. 4. a. above and that he "made untrue statements in his EEOC responses and Department of Labor documents and other statements." (Plaintiff's Dep,, Ex. 3; Responses 18 &19, Plaintiff's Responses to Defendant's First Set of Interrogatories, Requests for Production of Documents, and Requests for Admissions) Despite providing the aforementioned response to written interrogatories directed to him, Plaintiff testified in his deposition that Ohlson's actions included participation in the discriminatory conduct and not reporting it. (Plaintiff's Dep., pp. 264.20; 266.3, 6-7)

Ohlson commenced his employment with FWE in 2007 or 2008 in the position of Supervisor in the Refrigeration Department. Ohlson was employed in that position until late 2015 when his job title changed to group leader. (Ohlson Dep., pp. 13.14; 14.3-9; 16.7-8)


In analyzing claims pursuant to T.C.A. § 4-21-301, the Tennessee Supreme Court borrowed from the common law civil liability theory of aiding and abetting, stating that Tennessee law requires that "the defendant knew that his companion's conduct constituted a breach of duty and that he gave substantial assistance or encouragement to them in their acts" to be liable for aiding and abetting. *Carr v. United Parcel Serv.*, 955 S.W.2d 832, 836 (Tenn. 1997). Therefore, "aiding and abetting requires affirmative conduct" by the individual. *Id.* Accomplice liability "is not imposed based on the individual defendant's own discriminatory

20

acts; it requires distinct conduct that aids or abets discrimination by the employer." *Rhea v. Dollar Tree Stores, Inc*., 395 F. Supp. 2d 696, 705 (W.D. Tenn. 2005) (citing *McNeail-Tunstall*, 307 F. Supp. 2d at 974). Furthermore, "a supervisor who is merely acting in fulfillment of his duties cannot be held individually liable for discrimination under the THRA." D*obson v. City of Gallatin*, No. 3:05-cv-0521, 2006 WL 3805659, *3, 15 (M.D. Tenn. Dec. 22, 2006).

T.C.A. § 4-21-301 implicitly requires that there must be affirmative conduct separate and distinct from that alleged discriminatory conduct attributed to the employer for there to be an actionable claim against an individual who is not the employer. No such facts exist here to demonstrate that Gates, Pilkington, Coddington and Ohlson "aided, abetted, incited, compelled or commanded" the alleged discriminatory conduct of FWE and accordingly such claims should be dismissed.


**D.** **Plaintiff Was Not Subjected to Outrageous Conduct.**

The FWE Defendants submit that Plaintiff cannot establish one or more essential elements of his claim for outrageous conduct and accordingly this court should dismiss such claim. The Tennessee Supreme Court enumerated the required elements of a claim for outrageous conduct in *Bain v. Wells*, 936 S.W.2d 618 (Tenn. 1997). The *Bain* Court stated as follows:

> With regard to intentional infliction of emotional distress, or outrageous conduct, there are three essential elements to this cause of action: "(1) the conduct complained of must be intentional or reckless; (2) the conduct must be so outrageous that it is not tolerated by civilized society; and (3) the conduct complained of must result in serious mental injury."

*Id.* at 622

The *Bain* court advised that the above is not an easy burden to meet, stating as follows:

[T]his Court has adopted and applied the high threshold standard described in the Restatement (Second) of Torts as follows:

> The cases thus far decided have found liability only where the defendant's conduct has been extreme and outrageous. It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by 'malice,' or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous.'

*Id*. at 622-23.

Plaintiff has identified the conduct underlying his Title VII, 1981 and THRA claims as constituting "outrageous conduct." (Plainitff's Dep., Ex. 3; Plaintiff's Responses to Defendant's First Set of Interrogatories, Requests for Production of Documents, and Requests for Admissions Numbers 9, 21, 26, 31, 36). This conduct is set out in Section II. B. 4. a. above of this Memorandum. As a general proposition, this type conduct is not sufficient to establish the necessary and required elements of a claim for outrageous conduct in Tennessee.

Within the context of an age discrimination and retaliation action involving Tennessee statutory and common law, the Tennessee Court of Appeals addressed and affirmed the dismissal of a plaintiff's claim for outrageous conduct, stating as follows:

> In Count VI of his amended complaint, Newsom contends that Textron's actions surrounding his termination were outrageous and caused him extreme humiliation and embarrassment. Newsom avers that Textron reported his actions in the competitive bidding process to the federal government without probable cause and before a thorough investigation of the facts on which the report was based. In addition, Newsom states:
>
>> After terminating him, Textron provided him with a large brown plastic garbage bag into which he was required to place his personal possessions, which had been accumulated during just under thirty-five years of employment with Textron. He was then

ushered to the exit through a common area at Textron where he was required to walk in front of his work peers and associates who he had known for many years.

Newsom contends that these actions are "beyond the pale of decency" and constitute outrageous conduct.

… Furthermore, this Court, commenting on the tort of outrageous conduct, has stated:

> It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by 'malice,' or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as utterly intolerable in a civilized community. Generally, the case is one which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!'

*Blair v. Allied Maintenance Corp.,* 756 S.W.2d 267, 273 (Tenn. App. 1988) (quoting Restatement (Second) of Torts § 46 cmt. d (1965)).

The record in this case does not reveal conduct that would support a charge of outrageous conduct, because the actions *complained* of do not rise to the level of outrageous, beyond the pale of decency, and atrocious and utterly intolerable in a civilized society.

*Newsom v. Textron Aerostructures*, 924 S.W.2d 87, 97-98 (Tenn. Ct. App. 1995).[10]

---

[10] There are a number of other Tennessee appellate and federal district court decisions addressing employment based situations where claims for outrageous conduct have been asserted. None of these cases have allowed outrageous conduct claims to stand when confronted with either motions for summary judgment or motions to dismiss. ("The Court concludes as a matter of Tennessee law that the employee handbook cannot constitute a contract of employment and that the actions of the defendant described by the plaintiff do not rise to the level of outrageous conduct. - *Claiborne v. Frito-Lay, Inc.*, 718 F. Supp. 1319, 1320 (E.D. Tenn. 1989); "The complaint in this action is replete with conclusions couched in the language of *Medlin, supra*, but does not undertake to describe the substance and severity of the conduct of appellee's employees which allegedly amounted to harassment, nor the substance and severity of the conduct of Pinkerton in its investigations, nor the actions of Western Electric in attempting to discipline appellant ." - *Swallows v. Western Electric Co.*, 543 S.W.2d 581 (Tenn. 1976); "We fail to see how defendants' conduct in allowing plaintiff to resign and secure additional benefits as an alternative to discharge by the hospital can amount to outrageous conduct." *Bringle v. Methodist Hospital*, 701 S.W.2d 622 (Tenn. Ct. App. 1985)); Plaintiffs asserted an outrageous conduct claim within the context of any employment termination claim for retaliatory discharge. "… This record does not support Plaintiff's claims for the tort of

23

Plaintiff McGee relies on the same facts and circumstances to assert his claim of outrageous conduct or intentional infliction of emotional distress as he relies on to assert his discrimination and retaliation claims. (See Section II. B. 4. a. above). Whether discriminatory or retaliatory in violation of applicable law, these facts and allegations simply do not rise to the level of "outrageous," "beyond the pale of decency," and "atrocious and utterly intolerable in civilized society." Certainly as illustrated by the decision of the Tennessee Court of Appeals in *Newsom* and those other decisions in cited in footnote 8, this claim is difficult, if not impossible, to establish within the context of employment based claims, and the facts upon which Plaintiff relies in this instance are certainly deficient.

With regard to the third necessary element of intentional infliction of emotional distress, the Tennessee Supreme Court has noted that:

> [S]erious mental injury is that in which "'the distress is so severe that no reasonable [person] could be expected to endure it.'" [*Miller v. Willbanks*, 8 S.W.3d 607, 615 n.4 (Tenn. 1999)] (quoting Restatement (Second) of Torts § 46 cmt. j (1965)).

*Levy v. Franks*, 159 S.W.3d 66, 85 (Tenn. Ct. App. 2004). In *Miller v. Willbanks*, our Supreme Court emphasized:

> Although the plaintiff is generally not required to present expert testimony to validate the existence or severity of a mental injury, we emphasize that the evidence must establish that the plaintiff's mental injury is serious or severe.
>
> It is only where [the mental injury] is extreme that the liability arises. Complete emotional tranquility is seldom attainable in this world, and some degree of transient and trivial emotional distress is a part of the price of living among people. The law intervenes only where the distress is so severe that no reasonable [person] could be expected to endure it.
>
> *Miller v. Willbanks*, 8 S.W.3d 607, 615 n.4 (Tenn. 1999) (quoting Restatement (Second) of Torts § 46 cmt. j (1965)). Our Supreme Court also has instructed: "A person acts intentionally when it is the person's conscious objective or desire to

---

outrageous conduct." *Kent v. Edwards & Associates, Inc.*, 2000 Tenn. App. LEXIS 2 (Tenn. Ct. App. Jan. 25, 2000).

engage in the conduct or cause the result." *Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896, 901 (Tenn. 1992).
*Akers v. Prime Succession of Tenn., Inc.,* 387 S.W.3d 495, 502 (Tenn. 2012)

Shifting to Plaintiff's alleged damages, he has testified that he did not have "down time even outside work"; was "feeling more inferior, feeling disparaged, feeling like not equal, not as valuable as my co-workers"; "feeling that I don't have the same opportunities as they do"; and "I'm dealing with just being subjected to so many overwhelming racial slurs on a repeated basis. That's what I mean, severe." (Plaintiff's Dep., pp. 271.22 – 272.12). He was not treated by a healthcare professional for any of the damages which he contends that he incurred as a consequence of the Defendants' alleged actions. (Plaintiff's Dep., pp. 272.21-273.1; Ex. 3, Response to Interrogatory Number 39, Plaintiff's Response to Defendant's First Set of Interrogatories, Requests for Production of Documents and Requests for Admissions) Plaintiff's alleged damages certainly do not rise to the level of "severe or serious."

The FWE Defendants submit that Plaintiff is unable to establish the necessary elements to establish this claim, and accordingly it should be dismissed.


### III.     CONCLUSION

The FWE Defendants submit that there are no disputed issues of material fact regarding Plaintiff's claims for race discrimination, hostile work environment and retaliation in violation of Title VII, Section 1981 and the THRA; outrageous conduct; and violation of T.C.A. § 4-21-301, and that they are entitled to judgment as a matter of law dismissing with prejudice all of such claims. Accordingly, the FWE Defendants respectfully request that this Court dismiss all of Plaintiff's claims with prejudice.

25

Respectfully submitted,

BUTLER SNOW, LLP

By:/s/ H. Rowan Leathers III
H. Rowan Leathers III (BPR No. 10023)
Sara Anne Quinn (BPR No. 29424)
April N. Knox (BPR No. 33392)
The Pinnacle at Symphony Place
150 Third Avenue South, Suite 1600
Nashville, TN 37201
(615) 651-6718
rowan.leathers@butlersnow.com
saraanne.quinn@butlersnow.com
april.knox@butlersnow.com

*Counsel for Defendants*

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing Memorandum of Law In Support of Motion for Summary Judgment was filed with the court via the Court's ECF Filing System on this 22nd day of April, 2016 for service on the below listed counsel:

Douglas B. Janney III                   Cynthia A. Sherwood
2002 Richard Jones Road                 Sherwood Boutique Litigation, PLC
Suite B-200                             201 Fourth Avenue North, Suite 1130
Nashville, TN 37215                     Nashville, TN 37219
doug@janneylaw.com                      cynthia@sherwoodlitigation.com

*Attorney for Plaintiff*                *Attorney for Plaintiff*

/s/ H. Rowan Leathers III

30884875v1

26